LOTTINGER, Judge.
On the 16th day of December, 1947, Floyd Bergeron, minor son of the plaintiff in'this suit, was severely injured .when the bicycle upon which he was riding, collided 'with a ■ Department of Highways *338 truck, driven at the time by one Jeffrey LeBoeuf. Suit was brought after legislative permission was granted through Act 251 of 1948. The original petition joined as defendants the Department of Highways, Great American Indemnity Company of New York 'City, liability insurer of Department of Highways, and Jeffrey Le-Boeuf, the driver of the truck. Supplemental and amended petitions were later filed which named as defendants the State of Louisiana, through the Department of Highways, Great American Indemnity Company of New York City and Jeffrey LeBoeuf. Various exceptions which were filed and argued were either overruled or referred to the merits, and now seem to have passed out of the picture. Defendants then answered denying any negligence on the part of LeBoeuf and in the alternative pleaded contributory negligence on the part of Floyd Bergeron. The case comes to this court on an appeal by the plaintiff from a judgment dismissing his suit.
Before proceeding to an analysis of the testimony, we will endeavor to describe the location of the accident. In this connection, we are favored with a map drawn by Robert H. Wright, C. E., which was introduced into evidence by counsel on both sides as Joint Exhibit “A”. West Main Street in the City of Houma (also State Route No. 69) runs east and west and consists of an 18 foot concrete slab built by the State and two concrete slabs each 9 feet in width on each side thereof built by the City of Houma, making in all a 36 foot paved street. On the south side of the street there is a 5.5 foot concrete sidewalk abutting the pavement mentioned above. The sidewalk is not curbed and is on the same general level as the street. The evident reason for the construction of the sidewalk in such fashion is that immediately to its south is the freight yard of Morgan’s Louisiana and Texas Railroad, which fronts thereon for a distance of approximately 160 feet. Five spur tracks traverse the sidewalk and street within this distance. It is clear from the evidence that for a number of years trucks and other vehicles have used this entire frontage as a means of ingress and egress to and from the yards to the freight cars spotted thereon.
With this picture of the location in mind, we proceed to an analysis of the facts. Immediately prior to the accident, at about 4 o’clock P. M., young Floyd Bergeron, who was then 15 years of age, was proceeding howeward from Terrebonne High School on his bicycle, travelling east on the right or south side of West Main Street. There is much dispute as to whether he was on the street or sidewalk portion then and at the time of the accident. This point, however, will be discussed later. At that time a truck belonging to Patterson Mud and Chemical Company was situated on one of the spur tracks, and was either coupled to or in the process of being coupled to a railroad car, preparatory to pulling same across the street. The front end of the truck faced in a northerly direction. There is much dispute as to the position of this truck in relation to the sidewalk, i.e., whether it was entirely on the south of the sidewalk, or whether any part of it extended beyond the sidewalk. Le-Boeuf, meanwhile had been proceeding west on West Main Street and made a left turn in order that he might go into the freight yards to get a load of shells. Either just before the truck reached the sidewalk, or just after having begun to cross same, young Bergeron’s bicycle ran into the forward position of the right fender. The bicycle veered off to the right, Bergeron was thrown to the left on the ground and the right rear wheel of the truck rolled over him causing the painful and serious injuries for which recovery is sought.
Reverting to the exact path of the bicycle, we find, as did the lower court, that Bergeron was travelling on the sidewalk rather than in the street. In paragraph 4 of his petition, it is related that he was “three or four feet south of the paved portion of said highway or street.” When questioned as to his location he stated that he was not on the sidewalk, but in the street. Defense counsel, however, made timely objection to any testimony varying the allegations of the petition which was sustained. Counsel for appellant argues *339 that even if the objection is good, that this court can consider the testimony of witnesses who testified prior to the objection and who stated that the hoy was in the street. Wih reference to this particular point, we are inclined to believe that if the testimony was admitted without objection, this testimony that was admitted without objection could have been objected to and wasn’t, then we think that the testimony that was admitted without objection can be taken into consideration in the analysis of the facts. From the physical facts as will be pointed out later, we believe, nevertheless, that the accident occurred on the sidewalk as alleged in plaintiff’s petition. It might be well to point out here that due to the fact that trucks and other vehicles crossed the sidewalk frequently that same was littered with gravel, shells and other matter and was in many places barely discernible. According to the evidence and physical facts as found in this case, it likewise appears that young Bergeron was riding on the sidewalk after having passed the Patterson truck and that the impact or collision took place either on the sidewalk or near the south edge of the sidewalk or immediately south of the sidewalk in the railroad yard, because the evidence indicates that after the impact young Bergeron was lying on or at the north edge of the sidewalk. It is to be remembered that when the collision occurred, the bicycle went to the right and young Bergeron was thrown to the left under the right rear wheel of the truck. This being so, it would have been impossible for Bergeron to have been riding in the street at the time of the collision, due to the position of his body after the accident occurred. If he had been riding in the street, and the collision had taken place in the street, his body would have been thrown further north and into the street proper.
While the testimony relative to the position of the Patterson truck is conflicting, here we find ourselves in agreement with the trial court. Some witnesses testifying for plaintiff, said that the truck was clear of the sidewalk and that pedestrians were walking in front of it on the sidewalk. However, one Cleveland Boudreaux, who also testified for plaintiff and who was standing next to the truck at the time of the accident, stated that the truck was on the sidewalk and that the front bumper extended one foot beyond same into the street. The testimony of this witness is confirmed by that of another of plaintiff’s witnesses, one Fred Canter, who was standing on the top of the boxcar just to the rear of the truck. While Canter’s testimony during the trial was rather confused, in a written statement made tvro months after the accident he stated that the Patterson truck was parked “with the front end about where the street meets the sidewalk.” We conclude, therefore, that the truck was on the sidewalk and that it was necessary for young Bergeron who was travelling on the sidewalk, to have to go around it.
The testimony regarding the manner in which LeBoeuf made the left hand turn and proceeded toward the freight yard is not in much conflict. LeBoeuf states that he stopped, put out his hand, shifted to first gear, and after seeing.no traffic within 200 feet, proceeded to turn. The testimony of other witnesses is that he did not come to a complete stop. However, from all of the testimony it seems clear that he did slow down and that he made the turn at about average turning speed. As a matter of fact, LeBoeuf testified that he was trav-elling about 8 miles an hour and we shall estimate his speed about 8 to 10 miles an hour. It is also clear from the testimony of those who saw young Bergeron that he was proceeding at a modest rate, probably at about the same speed as the truck.
By the use of the map together with the testimony of the witnesses, it appears that the bicycle, just before LeBoeuf 'began his turn, must have been about 50 feet from the point of impact and some 10 feet west of the Patterson truck. Doubtless, he was then at a point where he could not be seen by LeBoeuf. Clearly, then, there was no negligence on the part of LeBoeuf, in making his turn, for having seen no approaching vehicles, he was not bound to have assumed the presence of one which was hidden behind the Patterson truck.
*340 It is dear from the testimony of the Bergeron boy himself that he was familiar with the location and knew that tracks frequently traversed the sidewalk in front of the freight yard. Although he stated that he was watching where he was going, he stated that “when I saw it, it wasn’t too far from me. I couldn’t say exactly how far it was, and when I did see it, it was too late for me to do anything.” And again on cross examination this time, he again admitted not having seen the truck until too late to do anything about it. The fact that he was going straight east in the street or sidewalk and had nothing to obstruct his view after having passed the Patterson truck and the fact that the impact or collision occurred on the sidewalk or on the south edge of the sidewalk or in the railroad yard immediately adjacent to the south edge of the sidewalk, plus the further fact that he did not observe the highway truck, which was immediately in front of him until an instant before the ■collision indicates that the boy was not looking, and that the Bergeron boy was grossly negligént.
Plaintiff has raised the question of last clear chance. The law of this state on the question of last clear chance is very well, pronounced by the Supreme Court in several cases, and we will now attempt to quote excerpts from two of the leading cases on this point. In the case entitled Rottman v. Beverly, reported in 183 La. 947, 165 So. 153, 156, the Supreme Court through Justice Odom, had this to say:
“But if a plaintiff negligently puts himself in a place of danger and his negligence and danger are actually discovered by the defendant, then there devolves upon the defendant a duty which intervenes or arises subsequent to the negligent acts of the plaintiff, and that duty is to save the plaintiff from the consequences of his negligent acts if he can. The first duty of those who operate engines or motor vehicles is to keep a sharp • lookout ahead to discover the presence of those who might be in danger. If they perform that duty and discover that some one is in danger, then a second duty arises, and that is to use every possible available means to avert injury. If the defendant fails to perform that duty, his negligence in that respect is regarded as the proximate and immediate cause of the injury and the negligence of the plaintiff in putting 'himself in a place of danger, the remote cause. In such cases the last clear chance doctrine applies even though plaintiff’s negligence continues up to the accident.
"There are numerous cases holding that the doctrine of last clear chance never applies unless the danger is actually discovered by the defendant. Other cases go further and hold that the doctrine applies where the danger could and should have been discovered by the exercise of due diligence. See case note, 92 A.L.R. 128, 129; also “Doctrine of Discovered Peril or Last Clear Chance,” 20 R.C.L. § 114-page 138. * * *
“In cases of discovered peril, it is pertinent and material to ascertain whether the defendant could, after discovering plaintiff’s peril, have averted the accident by the 'exercise of due diligence. If he could have averted the accident by the exercise of due diligence and failed to do so, his negligence in that respect is considered the proximate and immediate cause of the injury, and the plaintiff’s negligence the remote cause, and the plaintiff may recover although his negligence continued to the instant of the accident. The basis of recovery in such cases is the defendant’s superior knowledge of the peril and his ability to avoid the injury. He has the last clear chance. 20 R.C.L. § 116, page 141.
“Of course, there can be no recovery against defendant if he used due care in discovering the peril and after discovering it could not avoid the accident, as in such case there would be no negligence at all on the part of the defendant.”
Then again in the case entitled Jackson v. Cook, as reported in 189 La. 860, 181 So. 195, 197, the Supreme Court through Justice Odom had this to say:
“This makes it clear enough, we think, that we did not intend to, and did not, set aside the well-recognized and settled rule that the duty of those in charge of motor *341 cars and engines to look ahead and observe never ceases; that what they can see they must see and in legal contemplation they do see; that their failure to see what they could have seen by the exercise of due diligence does not absolve them 'from liability.
“Up to the time the Court of Appeal decided the Rottman Case, 162 So. 73, the jurisprudence relating to the last clear chance doctrine was confusing. This court in several cases had said in general terms that, where the negligence of a plaintiff continued up to the moment of the accident, there could be no recovery. Such statements had been made without qualification, and what we held in the Rottman Case was that such statements were too broad, and we qualified the rule by holding that, when a defendant sees another in peril of which the other is not aware, then a second or subsequent duty arises and devolves upon the defendant, which duty is to use every possible available means to avert injury. * * *
“The only difference between the Rott-man Case and the case presently before us is this: In the Rottman Case Mrs. Rottman was guilty of gross negligence which continued up to the moment of the accident. Beverly, the driver of. the automobile, actually saw her in her perilous position in time to avert the accident had he used proper precautions. In the present case the plaintiff was guilty of gross negligence which continued up to the moment of the accident. The driver of the car did not see, but could have seen, plaintiff in his peril if he had been looking ahead. The mere fact that the driver of the car in this case did not see plaintiff does not absolve the defendant from liability, because it was the duty of the driver to look, and, according to the findings of both courts, he was not looking.”
We shall therefore further analyze the facts in this case to see if it comes within the rule as stated by the Supreme Court as quoted above. It appears from the testimony of the truck driver, LeBoeuf, that when he was going in the yard to get his load and as he turned, he was just getting on to the side where the sidewalk should have been when he first saw the little boy on the bicycle, just as he was hitting his truck. In answer to a direct question to LeBoeuf, “Now did you see the boy on the bicycle prior to him coming in contact with your truck?” “No, I didn’t see him before we hit.” The record further indicates that the truck that LeBoeuf was driving was in good , condition, equipped with good tires and good brakes and that he was only trav-elling about 8 miles per hour, according to LeBoeuf’s testimony, and LeBoeuf claims that he could have stopped the truck in 5 feet if he had seen something to stop for.
The trial judge in his written reasons for judgment, very carefully analyzes the distance travelled by the truck after making the turn and by the use of tables concludes that it would have been impossible to avoid the accident even if LeBoeuf had seen the boy. We quote from the trial judge’s written reasons, the following:
“The testimony shows that the truck driver did not stop before making his' turn. Otherwise, the testimony impresses us as indicating that the turn was made in the same manner as an average, reasonably prudent driver; that is, the driver glanced around in making a quick survey for approaching traffic, and, in the absence of ány showing to the contrary, made his turn at an average turning speed. We shall assume, in the light of our own experience, that this average speed was somewhere between ten and fifteen miles per hour. We gather from the testimony that that was the probable approximate speed of Floyd Ber-geron on the bicycle.' In the absence of any more specific testimony-, we shall assume the turning speed of the truck and the rate of progress of the bicycle to be about 13 1/2 miles per hour, or for the sake of convenient calculation 20 feet per second. That the truck could hardly have exceeded that speed and was more likely traveling at a slower rate is indicated by the fact that he traveled a distance less than the length of the truck from the point of impact to the point of stopping. As the truck driver approached the point where he began his turn, it is quite évident that *342 his quick survey must have indicated no approaching traffic from either direction close enough to prevent a safe turn, except possibly the bicycle and its rider, since subsequent events disclosed that to have been the situation. We 'have estimated the truck driver to have begun his turn at a point approximately 40 feet from the point of impact, as is shown by the lines marked on the duplicate print of joint exhibit ‘A’. Since, in order to insure safe passage, it was necessary to survey traffic before making a turn, that general survey must have continued to the moment of beginning the turn. At a point marked K, 50 feet away from the point, (10 feet from the point of beginning the turn, marked L), the bicycle must have been at a point on the sidewalk 50 feet away from the point of impact, marked Z, or about 10 feet from and West of the front of the Patterson truck on the sidewalk, the said truck being marked P. At those points, K and Z, the driver of the trade and the rider on the bicycle were approximately 90 feet from each other. The use of a rule on the duplicate of joint exhibit ‘A’ will indicate that a view of the bicycle must have been difficult since the bicycle and the rider are likely to have been very nearly screened from view by the front of the Patterson truck. This view of the scene impels us to conclude that at that point the truck driver was not negligent in assuming he could negotiate a safe entry into the railroad yard. At point L, where we calculate the driver began 'his turn half a second later, he was about 70 feet away from point Y, the then approximate position of the bicycle about 4 feet from the Patterson track and slightly to the North of the sidewalk. For us to hold that the negligence of the truck driver began at that point by not stopping to make a further survey would be tantamount to holding that the driver of an approaching vehicle is bound to have kept his eyes focused upon the only point which subsequent events showed to be the place from which an unexpected approach was made. We use the term ‘unexpected approach’ advisedly for the reason that an ‘expected approach’ on a sidewalk would have been that of a pedestrian. While an abundance of precaution might suggest the advisability of a careful examination of every point on the compass, such care and caution would exceed that expected of an ordinarily prudent and careful driver. Reasonable caution would require a general survey of all likely points of approach and, on discovery of no approaching hazard, would prompt and suggest a turn without further delay. It does not seem reasonable to us to hold that the truck driver should have anticipated the likelihood of an approaching bicycle from the sidewalk beyond the Patterson truck, unless such approach was open to view. It is our opinion that at the moment the truck driver began his turn he saw all that he could have seen or, at least, all that he should have been expected to see. Consequently, we find no negligence in his venturing to turn and cross when he did.
“Once he had begun his turn it is more than problematical whether he could have avoided the accident. Let us assume that he might have seen the approaching bicycle after he had traveled the length of his truck after beginning his turn. According to the measurements in the record he would have traveled 16 1/2 feet of the 40 feet we have calculated 'he traveled from the time he began his turn to the moment of impact,, a lapse of time of more than 3/4 of a second at the speed he was moving. Statistics compiled by the American Automobile Association (“Sportsmanlike Driving”, a publication copyrighted by said association) show that average ‘reaction time’ (the time-before mind and body react to a warning of danger) is 3/4 of a second. ‘Reaction time traveling distance’ is the distance a car will travel before one can make his. brakes begin to ‘take hold’. In the instant case ‘reaction time traveling distance’ would 'have been approximately the length of the truck. The next factor is ‘braking distance’, the distance a car travels after-the brakes are applied.
“If, as we have assumed hereinabove, the track driver caught sight of the bicycle after traveling the length of his truck after beginning his left turn, the ‘reaction time’ and ‘reaction time traveling distance’ would have involved traveling a further distance *343 equal to the approximate length of his truck to a point 7 or 8 feet from the ultimate point of impact. The ‘braking distance’ (the distance a car travels after the brakes are applied), would have carried the truck beyond the point of impact according to the reference cited hereinabove. (Note: — At a speed of 10 miles per hour “braking distance” with four-wheel brakes and the most favorable type of road surface is 7 feet; and at a speed of 15 miles per hour, “braking distance” under the same circumstances is 15 feet). Consequently, unless the truck driver saw the bicycle at any time after he had begun his turn, it is our view that it would have been practically impossible for him to avoid the collision. If he had turned right, the consequences would have been worse, since he would have run headlong into the bicycle. Hence, once the truck driver had begun his turn, his only logical course was to pursue and persist in the turn. It seems to us that after the truck driver began his turn it was reasonable and logical for him to direct most of his attention in the direction in which his truck was traveling, ahead. 'Consequently, the circumstances that the truck driver saw the boy on the 'bicycle just before the impact impresses us as a logical circumstance in the natural course of events. By the same process of reasoning, it seems to us that the bicycle rider, if he had been looking in the direction in which he was traveling, should have seen the truck traversing his path. The fact that he did not see it until a fleeting instant before the impact, according to his own testimony, indicates to us that he was not looking. If he had been looking it seems to us he should have seen and reacted to what he saw. In our view of the circumstances described herein-above, he is the only person who could have avoided the accident.”
We believe that the lower court fell into error in fixing the speed of the truck, while making the turn, at between 10 to 15 miles per 'hour. The lower court stated in its written reasons that, “We shall assume, in the light of our own experience, that this average speed was some where between 10 and 15 miles per hour.” He later fixes an average speed of the truck at 13 1/2 miles per hour. We find in the record as stated above that under direct examination of the defendant, LeBoeuf, wherein he states that when he was making the turn he was traveling about 8 miles per hour. In view of this admission, we feel somewhat compelled to accept that as his speed. We think that speed to foe approximately correct because we likewise find in the record that after the impact took place the truck only travelled the distance of the length of the truck, which indicates to us that he could not have travelled any more than 8 to 10 miles per hour. We gather from the testimony that that was probably the approximate speed of t'he Ber-geron boy on the bicycle. Likewise, in view of the expressions of the Supreme Court in the cases cited supra, we feel that the truck driver, LeBoeuf, likewise had a constant duty to perform and that was to keep a sharp lookout ahead to discover the presence of those who might be in danger. We observe from the sketch drawn by the lower court of a left turn, that the turn was not a sharp one, but a gradual turn, one that would be made in the usual and customary manner and not on a 90° angle, but more on a 45° angle. That being the case, the truck driver and the Bergeron boy on the bicycle, travelling in opposite directions or towards each other, that the truck driver had a better opportunity and chance to observe the Bergeron boy than at any other angle as that would have placed the bicycle immediately in front of him or in his front vision. Nothing has been pointed out to us that would indicate that the truck driver under those circumstances could not have seen the Bergeron boy after the Bergeron boy had passed the Patterson truck, as he was out in the open and in the clear view of the truck driver. Therefore, under those circumstances, we conclude that LeBoeuf, the truck driver, could have and should have seen Bergeron after the Bergeron boy passed the Patterson truck and that LeBoeuf’s failure in not seeing the bicycle makes him guilty of negligence under the rule as stated above. This is evidently true because LeBoeuf, the truck driver, says that he did not see Bergeron *344 at all before the actual impact took place and we know of no reason why he should not have seen him if he had been keeping a proper and sharp lookout ahead as is required under the law. The Supreme Court, in the case of Jackson v. Cook, above quoted, stated that the duty of those in charge of motor cars and engines to look ahead and observe never ceases and that what they can see they must see and in legal contemplation they do see and their failure to see what they could have seen by the exercise of due diligence does not absolve them from liability.
We next come to the important point in the case and that is if the truck driver had been looking and had seen the boy on the ■bicycle could he have avoided the accident. In the discussion on this point, we will use the same map or print that the lower court used in calculating and estimating the respective distances that the truck driver and bicyclist were from each other before, during and at the time of the actual impact. It is to be borne in mind that the lower court used the speed of 10 to 15 miles per hour, or an average of 13 1/2 miles per hour, whereas, we find in the record the speed of the truck to be about 8 miles per hour, but assuming for the sake of argument that the speed of the truck driver was 10 miles per hour, and that the speed of the bicyclist was approximately the same, we find that the truck and the bicyclist are approaching each 'Other from opposite directions at about the same speed foot for foot. In using the same sketch as was used by the lower court, we find that-the scale on this sketch is one inch equals 10 feet. We likewise • observe that at the point marked L, which is the position of the truck at the time that he commenced his left turn, according to that scale is approximately 40 feet travelling distance to the point of impact, the point of impact being •on the south edge of the sidewalk. At this same time, when the defendant truck driver is at point L, as shown on the sketch; the bicyclist is at the point Y on the sketch, which is likewise approximately 40 feet'to the point of impact. Therefore, when we advance the truck and the bicyclist approxi- ■ mately two inches hearer each other, this •places the truck approximately 20 feet from the point of impact and the bicyclist approximately 20 feet from the point of impact. From this, we can see that the trav-elling distance between the bicyclist and the truck is approximately 40 feet apart. At this point no reason whatsoever can be given as to why the truck driver could not or did not see the Bergeron boy. We think if he had been looking, at this point, he certainly could have observed the bicyclist in his peril and if LeBoeuf was travelling at the rate of 10 miles per 'hour, we think that he could have stopped the truck within a total -distance of 15.5 feet. We find in Blashfield’s Cyclopedia of American Law and Practice, under Section 6237, a chart which indicates the distance within which a vehicle can be stopped at the rate of 10 miles per ’hour. It indicates that at that speed, the vehicle is moving at the rate of 14.5 feet per second. That the average driver reacts to a warning in 3/4 of a second at which time the vehicle has travelled a distance of 11 feet and that the actual stopping distance of a vehicle with brakes in excellent condition, is 4.5 feet and that the total distance required to stop is 15.5 feet. It is to be remembered that LeBoeuf testified that the truck was in excellent condition, equipped with good tires and good brakes and that he could stop his truck in 5 feet if he had seen something to stop for, which indicates that his truck was in excellent condition. We therefore think, that if LeBoeuf 'had been looking and had observed the bicyclist, he could have stopped, or have done something to have avoided the accident in time. We therefore think, that the truck driver, LeBoeuf, under the circumstances, had the last clear chance to avoid t'he accident; that he should have observed plaintiff’s son in his peril and had ample opportunity within which to have avoided the accident.
The plaintiff in this case, Frank Berg-eron, is the father of Floyd Bergeron, the injured boy, and he brings this suit for himself individually and for and on behalf of his minor son, • Floyd Bergeron, who was 15 -years of age at the time of the accident. Petitioner claims that he is entitled to damages for himself individ *345 ually in the amount of $4994.29, which represents expenses he has paid for and on behalf of his son as a result of this accident. He has itemized those damages as follows:
A. Ellender Memorial Hospital.. $ 277.10
B. Dr. S. Ernest Ellender. 356.00
C. Nurses . 501.00
D. Chauvin Funeral Home — for ambulance service. 35.00
E. Hotel Dieu . 1720.19
F. Dr. John G. Menville. 1900.00
G. Costs of extracts of hospital records.,. 5.00
H. Expenses & .transportation for his wife, in order to attend son . 200.00
$4994.29
We find that all of these items of expenses and statements have been proven with the exception of the last item mentioned, amounting to the sum of $200, nevertheless, we think that the plaintiff has proven at least $58.90 of said item as expenses in connection with this accident. This makes a total of $4853.19. We have not found any dispute as to these figures and believe that the plaintiff, Frank Bergeron, is entitled to a judgment for himself individually for this amount, plus interest and court costs.
The plaintiff likewise claims damages for and on behalf of his minor son, in the .amount of $306,500.00, for the injuries and damages as follows:
A. Injury to hip and region ... $ 25,000.00
B. Physical pain and suffering . 15,000.00
C. Mental pain and anguish ... 15,000.00
D. Being retarded at least one year in education. 1,500.00
E. Permanent injury to bladder & urinal passage. 20,000.00
F. Permanent injury to Floyd’s sex organs. 200,000.00
G-. Expected future medical expenses which should be recovered for and on behalf of this boy. 15,000.00
H. Anticipated future hospital and attending fees. 15,000.00
$306,500.00
There is no question but that the accident caused serious injury and damage to the boy. As a matter of fact, defendants in their brief admitted “that Bergeron suffered serious injury can not be denied”. On the same day of the accident, Floyd Bergeron, the injured boy, was taken to Ellender Memorial Hospital in the City of Houma, Louisiana, where he was under observation' and treatment by Dr. S. Ernest Ellender. He remained at this hospital from December 16, 1947, to January 27, 1948. Dr. Ellender diagnosed the boy’s condition as a fracture of the two pelvic bones anteriorly, which produced a rupture of the bladder, permitting the urine to flow into the surrounding tissues. His diagnosis was later confirmed by X-ray. It was necessary for Dr. Ellender to operate on young Bergeron' as he was getting worse, as urine was seeping into the tissues so he operated on him to drain the bladder and prevent" the urine from flowing into the tissues. Dr. Ellender testified that young Bergeron ujas under dope quite a bit while in his institution and that he later sent young Bergeron to Dr. John G. Menville, of New Orleans, for special care and attention. Young Bergeron was placed in Hotel Dieu in New Orleans on February 16, 1948, and remained until May 6, 1948, under the special care and attention of Dr. Menville and that young Bergeron returned to Hotel Dieu on June 7, 1948, and remained until July 26, 1948, during which time Dr. Menville performed a total of 8 operations upon young Bergeron. Dr. Menville testified that all of these operations were necessary. Dr. Menville stated “that the operations were for the purpose of enabling this patient to void. The procedures were carried out in steps, starting with a major one, followed by consecutive procedures and finally by more radical procedures. In other words, the first major procedure was for the purpose and accomplishment of establishing a urethra, which had been obliterated by a rupture, appar *346 ently produced by an automobile accident.” It is to be understood that the “urethra is that channel through which the urine flows from the bladder to the outside”. It appears that Dr. Ellender had provided the patient with a catheter, passing to his bladder for the purpose of allowing the urine to flow into the outside and Dr. Menville’s chief work was to help nature in providing urine to flow through the urethra channel. It appears that on the date of the trial, which was in September, 1949, that young Bergeron was not cured or thoroughly well, but that he was still suffering as a result of his injury. It was necessary that he wear pads and rubber pants as he had no control of his urine. Dr. Menville expressed the opinion that it was impossible for him to say whether young Bergeron would ever develop a complete control of his urine. It was possible but up to the present,, although he had shown some improvement, it was far from being satisfactory. It is necessary that the young boy change these pads under the rubber pants quite often and he has testified to the fact that he uses an average of about two rubber pants per week.
Plaintiff is claiming loss of ,sex in the young boy as a result of this accident and Dr. Menville, who is a specialist in that part of the anatomy, has testified that in all likelihood, the young boy will never lead a normal sex life. On this particular point, Dr. Menville stated “No one can say with absolute certainty whether this boy will become potent. He has had enough time elapsing from the accident and from surgery to have shown at least a tendency towards a normal sex function if it would be likely to return. There ■has been enough trauma from the accident and possibly from the necessary subsequent surgery to act for this loss of function.” Dr. Menville further stated that “It would be my constant hope that this patient would regain his potency and every effort should be made to bring this about. On a basis of what has occurred and the subsequent time interval which has elapsed without results, the outlook of a return of potency is poor. I could not possibly state that he would not become potent, but the chances are very much against it, based on my preceding statement.” Dr. Menville was asked the direct question, Q. “Have any of the physical parts of this boy been either destroyed or seriously impaired that are necessary parts of sex functions? A. The anatomy, the normal anatomy of the entire posterior urethra around which sexual stimulation revolves has been obliterated by fibrous tissue or scar tissue which resulted from the trauma of the accident.” Dr. Menville stated on the trial that this boy should be observed at regular intervals for the rest of his life for the reason that the scar tissue around the reconstructed urethra is still present and that scar tissue has a tendency to contract and to obliterate the opening or lumen that has been created. He further stated that assuming that the opening is maintained it is necessary that the urine remain free from infection so that there is little chance of infection or back pressure on the kidneys, which would occur in a very short time were these two facts or principles adhered to. Dr. Menville stated further that the easiest treatment in the case now is prevention, because if a complication occurs, it might result in the same condition, similar to the one he was in when he first saw him and that it may not end as favorably as it has at the present time in spite of all the procedures that have taken place. Dr. Menville stated that he felt that he was lucky in getting the result that was obtained and that he may not be as fortunate if a similar procedure had to be carried out. Dr. Menville stated that he should be observed at least once a month and may lengthen it out into possibly 2 or 3 months.
There is no doubt that the boy had considerable suffering and pain during the time he was hospitalized, considering the severity of the injury received. It is indicated that the right rear wheel ran over the boy’s body in the vicinity of his hips and that this fractured the two pelvic bones, which produced a rupture of the bladder. We find that this boy remained in the hospital approximately a total of 24 weeks, during which time, he was operated on for a total of nine operations. Dr. *347 Ellender stated that the boy suffered considerably and it was necessary to administer sedatives. The boy’s mother stated that at times, when he was suffering with such excruciating pain as a result of the injury that he would cry and say “0 God, why didn’t he kill me instead of leaving me here to suffer like this.” His mother further testified that during these spells, he would pull his hair and she and the nurses would have to hold him down and that they would have to administer sedatives to him. There is no doubt in our mind that the young boy experienced considerable pain and suffering as a result of this injury. We have our serious doubts as to whether this boy will ever be able to enjoy and lead a normal life. We do not think that he will ever be able to do any hard work or do any work that would require straining because of the lack of control on his urine. Though the boy may look like a normal individual, we do not think that he will ever be able to live like one. On the date of the trial the boy had returned to school, but he complained of severe backache at times. Taking everything into consideration, we are of the opinion that the boy should be awarded damages in the amount of $20,000, with interest and court costs.
It appears from the record that the State of Louisiana, through the Department of Highways, has been issued a public liability and property damage policy through the Great American Indemnity Company of New York, and that the limits of liability in said policy amount to $10,000 for each person and $30,000 for each accident. Therefore, under the circumstances, the Great American Indemnity Company of New York is claiming that the extent of their liability can not exceed the limits of their policy or $10,000.
For the above and foregoing reasons, the judgment appealed from is hereby annulled, avoided and reversed and it is now ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Frank Bergeron, for himself individually, and against the State of Louisiana, through the Department of Highways, Great American Indemnity Company of New York, and Jeffrey LeBoeuf, jointly and in solido in the sum of $4853.19, with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings and that there be further judgment herein in favor of the said Frank Bergeron for and on behalf of his minor son, Floyd Bergeron,against the said State of Louisiana, through the Department of Highways, Great American Indemnity Company of New York, and Jeffrey LeBoeuf, jointly and in solido in the sum of $20,000, with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings.
It is further ordered, adjudged and decreed that the entire or total limit of liability of the said Great American Indemnity Company be limited herein to the amount of $10,000.
Judgment reversed.