83 So.2d 164 (1955)
James A. SMITH, Individually and for and on Behalf of His Minor Son, James Emmett Smith, Plaintiffs-Appellants,
v.
MANUFACTURERS CASUALTY INSURANCE COMPANY, Joseph Henry Hicks and Gulf States Utilities Company, Defendants-Appellees.
No. 4075.
Court of Appeal of Louisiana, First Circuit.
October 6, 1955.
Rehearing Denied November 22, 1955.
Writ of Certiorari Denied January 16, 1956.
*165 Breazeale, Sachse & Wilson, Baton Rouge, for appellants.
Taylor, Porter, Brooks, Fuller & Phillips, R. W. Williams, Baton Rouge, for appellee.
TATE, Judge.
This is a suit for damages caused by an intersectional collision. The collision involved *166 a motor scooter operated by a minor, James E. ("Jimmy") Smith, which before the accident was proceeding on Morning Glory Avenue (the right-of-way street) in an easterly direction; and a 1947 Plymouth automobile operated by Joseph Henry Hicks, approaching the intersection on Cherrydale Avenue, the inferior street, while going in a southerly direction.
James A. Smith, "Jimmy"'s father, instituted suit for medical and other damages occasioned himself, and on behalf of his son, for pain, suffering, and permanent disability. He filed suit against Hicks, Manufacturers Casualty Company (the liability insurer of Hicks' private car involved), and the Gulf States Utilities Company (Hicks' employer, for whom he was at the time of the accident admittedly acting as agent or employee).
Both streets involved were hard-surfaced and approximately 18 feet in width; the northwestern corner of the intersection was somewhat obstructed by bushes and trees, although the motorist on the inferior Cherrydale Avenue could obtain a clear view of the traffic on Morning Glory Avenue if he came to a complete stop either parallel to the stop sign on that corner, or before entering Morning Glory Avenue. The accident occurred at about 3:00 P.M. on August 27, 1952, and the weather was that of a usual summer day.
Neither we nor the able District Court had any difficulty in concluding that Hicks was guilty of negligence proximately causing the accident when he entered the right of way thoroughfare in disregard of oncoming traffic and without keeping a careful lookout. But we regretfully differ from the conclusion of the District Court that plaintiff is barred from recovery by the contributory negligence of young Smith in proceeding at excessive speed and without keeping a careful lookout.
There were no eyewitnesses to the accident, and neither participant was able to testify to the circumstances thereof; young Smith by reason of amnesia caused by the shock of the accident, and Hicks (not injured in the present accident) having subsequently died before his testimony was taken. Several people did hear the tremendously loud crash of the collision and the subsequent scream of the brakes, and the Reverend A. S. Lawrence, an Episcopal minister, turned in his office chair and saw the body of young Smith hurtling through the air above the scooter just before he fell to the ground 81 feet beyond the impact.
In the absence of eyewitnesses to the accident, the physical evidence at the scene of the accident is of especial importance in determining what happened. Fortunately, there is no serious conflict as to this.
After the two vehicles collided, the Plymouth made heavy skidmarks approximately 18 feet in length continuing from the center line of Morning Glory Avenue across the intersection and into Cherrydale Avenue. The motor scooter was deflected at right angle from its course along Morning Glory Avenue by the impact. The boy, Jimmy Smith, was thrown through the air, landing approximately eighty-one feet down Cherrydale Avenue from the point of impact, on the easterly (or far) shoulder thereof. The motor scooter came to rest 10-20 feet beyond the boy. The point of impact occurred approximately at the center line of Morning Glory Avenue, and either in the center of the intersection or in the westerly portion used by traffic proceeding south on Cherrydale, as was defendant Hicks. Thus each vehicle at the time of the impact was in its proper lane.
The physical evidence of the damages sustained by each vehiclechiefly left side of motor scooter; front grill, bumper, right bumper guard, and hood, of Hicks' Plymouthindicates in our opinion without serious doubt that the moving cause of the accident was the striking of the left side of the Smith motor scooter by the front (towards the right) of the Hicks' car.
Following the accident, young Smith was thrown through the air down Cherrydale Avenue in the direction Hicks was going (in a 90 degree change of his own previous course) for a distance of 81 feet! The motor scooter landed 10-20 feet yet further *167 beyond this. This fact is unquestioned, and the District Court so found.
By far the most probable inference we draw from these physical facts is that the Hicks car shot from the sidestreet and hit full-on the side of the Smith motor scooter, knocking it and the boy in the direction the Hicks car was going. This conclusion is supported by the statement of Hicks that he had not stopped at the stop sign (correctly admitted as an admission against interest, an exception to the hearsay rule) to the investigating policeman a few minutes after the accident, and also by the heavy skidmarks 18 feet in length (made by 4-wheel brakes, rather than the less efficient 2-wheel brakes) of the Hicks car, starting at the point of impact and showing the brakes were not applied until or after the impact. The usual tables indicate stopping distance after application of brakes as 18 feet at 20 mph (see Blashfield, Cyclopedia of Automobile Law and Practice, Volume 90, page 413), or 15.5 feet at 15 mph to 30 feet at 20 mph (see "Lawyers' Motor Vehicle Chart", International Enterprises, 1950). While these charts are just rough approximations, varying greatly with the braking efficiency of the car concerned or the type of road surface, the physical facts of the brakemarks strongly suggest an inference that Hicks proceeded into the intersection at a speed of at least 15-20 mph. It is further to be remembered that these brakemarks were made after the impetus of Hicks' car must have been slowed by the impact of great force with the motor scooter.
The District Court, having already concluded from Mrs. Babington's testimony (discussed below) that young Smith was speeding excessively, inferred that his own speed was the great force which threw his body the great distance (75-80 feet) through the air by the impact. But in the absence of any other explanation as a freak occurrence, if this were so, it appears that young Smith's body would have continued forward in the direction it was going before the accident at the assumed speed of 40-50 mph, rather than directly at right angles to its previous course.
In our opinion, the accident was caused by the heedless entry of Hicks into the main thoroughfare, and it would have happened whether young Smith was going the legal limit of 25 mph, or in excess of it at 40-45 mph. If Hicks looked for oncoming traffic at all, he looked at a place where his vision was obscured by trees and bushes. If Hicks had seen the motor scooter at all, we do not believe he (or at least any prudent driver) would have entered the intersection until the boy had passed. Founded on the inferences drawn from the physical facts, we believe Hicks must have entered the intersection at a time when Smith was so near to it, that Smith could not have avoided the accident whether going 25 mph or 45 mph.
Morning Glory Avenue was 18 feet in width. Hicks was halfway across it when the accident occurred. If, as the physical facts produced by the impact strongly indicate, Hicks entered at a speed of at least 15 miles per hour (21.9' per second), the collision occurred within one-half second after Hicks entered same; and if during the time Hicks was crossing 9 feet of Morning Glory Avenue to the point of impact, young Smith was approaching at a speed of 45 mph (which, as we shall indicate below, we feel to be a questionable deduction from Mrs. Babington's testimony), or three times as fast, it would mean that Hicks entered the intersection when young Smith was 27 feet from the intersection (and about 2/5th of a second from the intersection at the speed of 45 mph; slightly less than a full second if going at 25 mph). Even had Smith been going the legal rate of 25 mph (36.5' per second), he would have collided with Hicks before Hicks had cleared the 18 feet intersection (especially considering that the additional car length of 12-15 feet must clear the intersection), for he would have reached the intersection in less than a second while Hicks was still obstructing his path. Such mathematical calculations obviously cannot be accurate (for instance, two or three feet of shoulder should probably be added; also, the side of the scooter being hit, it had cleared the right side of the car, or thus been even *168 closer to the intersection at the time of the accident) and are extremely theoretical. But since very probably the speed of the scooter was less than 45 mph, and very possibly the speed of the car was greater than 15 mph, judging from the physical effects of the impact, such calculations are useful in indicating that Hicks entered the intersection when young Smith was so close to it, that Hicks could not have safely crossed same even if Smith was going the legal rate of 25 mph rather than any assumed greater rate.
And it may be added that even if we assume the most favorable conceivable speeds to defendants' position, namely Hicks' entry at 5 mph (7.3' per second), while young Smith approached at 50 mph, or 10 times as fast, it is at least doubtful either that the Hicks' vehicle could have cleared the intersection (18' plus the length of the car, a minimum of 12') before the Smith motor scooter, approaching from the same spot at 25 mph, collided with it; or that in the additional almost 1½ seconds involved in approaching at 25 mph rather than 50 mph there would be sufficient time to elapse to enable Smith to exercise judgment to avoid the accident by swerving or otherwise. But actually we believe the physical facts and the evidence indicate speed factors much less favorable to defendant.
Defendants argue that because technically Hicks may have entered the intersection (a split-second) ahead of the Smith motor scooter, Hicks had pre-empted same. As we recently commented, "The right of pre-emption is not accorded the driver who blindly enters a favored street, without regard to oncoming traffic, and then attempts to absolve himself of liability because * * * he was there first." Sonnier v. U. S. Fidelity & Guaranty Company, La. App. 1 Cir., 79 So.2d 635, at page 638.
It is unnecessary for us to discuss whether what were technically self serving declarations made by defendant Hicks to his insurance adjusters and others were admissible, even as restricted by the District Court to the sole purpose of impeaching the testimony of the investigating policeman that Hicks told him a few minutes after the accident that he had failed to stop before entering the intersection. For the sole effect of accepting such testimony would be to prove, not that Hicks had actually stopped before entering the intersection, but that he said afterwards (ex parte, and not under oath) that he had stopped. And we believe the physical results of the impact strongly indicate Hicks' entry into the intersection at a speed much in excess of what would be probable if Hicks had actually made an effective stop to look for oncoming traffic before entering the intersection.
The District Court reached its conclusion as to the excessive speed of young Jimmy Smith largely by the testimony of Mrs. Catherine Babington. Mrs. Babington testified that she observed the approaching motor scooter before turning into Morning Glory, four blocks from the scene of the accident, turned, was immediately passed by the scooter, and observed it for about four car lengths (60 feet) ahead of her before her attention turned to other matters. She formed the conclusion at that time that the boy was proceeding at an excessive rate of speed. She further testified that after turning onto Morning Glory Avenue she proceeded two blocks at what she estimated to be her "usual" speed of 20-25 mph, and was turning into her driveway when she heard the terrible noise of the crash an additional two blocks from her residence. Thus, the Smith motor scooter had covered four blocks while she had covered two blocks at her estimated speed of 20-25 mph, thus presumably (by the inference of the District Court) going twice as fast.
Bearing in mind that the defendants who pleaded contributory negligence have the burden of proving it, we greatly doubt that this testimony is sufficient to bear the burden. For of course the speed of the motor scooter may have appeared greater relative to this slowly-turning car; perhaps at this place 4 blocks from the accident, the boy had temporarily speeded to pass the slow-turning car; and we regard *169 it extremely unlikely that Mrs. Babington averaged her "usual" speed of 20-25 mph in this short two-block trip to her home, coming from a stop to turn into Morning Glory Avenue and necessarily slowing to turn into her driveway if she had accelerated to any appreciable extent. However, accepting the conclusion of the District Court on this question of fact that the motor scooter was proceeding at a speed of about 40 mph, we still do not believe that the excessive speed of the motor scooter was a contributory proximate cause of the accident.
We are certain that the lack of lookout was not a contributory cause of the accident. If young Smith looked and saw Hicks stopped (as defendants claim) or slowed, there was no duty on Smith on the right of way thoroughfare to anticipate that the stopped or slowed motor vehicle would proceed into the superior thoroughfare in disregard of traffic thereupon. If Hicks was proceeding at about 15 mph, (21.9' per second) (as stated in the police report based on admissions made by Hicks at the time of the accident), it took him just slightly under one second to cover the 10 feet from the stop sign north of the intersection to the point of impact in the center (9' out) of the road; and we do not believe that in this short one-second interval, young Smith could be deficient in lookouthe was under no duty to expect Hicks to fail to stop before that time, he had no time to take precautions to avoid an accident after that time. Thus, the slower Hicks was proceeding, the more reasonable was the assumption on the part of young Smith that Hicks would stop before entering the main thoroughfare; the faster Hicks was going, the more impossible it became for young Smith observing him to do anything to avoid the accident.
The excessive speed of young Smith to constitute contributory negligence defeating his action must be a proximate cause of the accident. The breach of the duty to proceed at the legal speed limit becomes a contributory proximate cause of the accident only when, had the motorist been proceeding at the legal rate, situated as he actually was on the main thoroughfare at the time the other vehicle approached to and entered the intersection, he could have avoided the accident; but because of the excessive rate, is unable to do so. And as we have previously noted in our opinion young Smith could not have avoided the accident caused by the heedless entry of Hicks on the main thoroughfare, whether young Smith had been going at the legal rate (25 mph) or in excess thereof even at 40-45 mphand we do not believe the evidence supports so high a rate on the part of the Smith motor scooter.
Quantum:
The minor, Jimmy Smith, incurred extremely serious and painful injuries and some permanent disability resulting from a "badly comminuted fracture of the subtrochanteric region of the left femur", that is, a left leg shattered near the hip. Due to these injuries, he underwent at least three reasonably serious and painful surgical procedures, being hospitalized on these occasions for a total of about two months; underwent regular and painful probing and treatment due to complications setting in by way of infection; was in traction for about four and one-half weeks; and a bed patient for about eight months, then on crutches for another month.
Just after Jimmy was permitted to bear his full weight, on June 14, 1953, the left leg was re-fractured. While defendants seek to place the cause as due to horseplay, the undisputed medical testimony indicates the re-fracture at the exact site of the old injury was due to the weakened bone structure caused by the accident. Further surgery re-setting this simple fracture followed, with consequent pain, and Jimmy was placed in a leg cast and immobilized at home in bed for about two months. He was fitted with a brace in early September, 1953, which he was still wearing at the time of the trial in May, 1954.
As a result of the accident, at the time of trial young Smith's left leg was 1½ to 1¾ inches shorter than his right leg. An "osteotomy" surgical procedure "cutting through the bone and realigning the bone" *170 was recommended to reduce this shortening by as much as an inch. At the time of trial, an orthopedic surgeon estimated the permanent disability as 20-25% of the lower extremity, with the estimate that if the osteotomy were successful, this permanent disability would be reduced by one-half. The left leg is permanently weakened as compared to the right, and it will be necessary for young Smith to wear a lift in his shoe throughout the remainder of his life.
Fixing the quantum depends upon all the facts and circumstances of each individual case, and while previous jurisprudence is of some assistance to us, each case varies greatly. Attempting to assess a monetary value to human pain and suffering is of necessity somewhat arbitrary. We know that young Jimmy Smith and his parents would not take the $150,000 prayed-for in the petition for the pain and suffering and permanent disability, if the horrible experience could have been avoided for him. But it is probable that no amount of money could actually compensate for such injuries, whereas it is our duty arbitrarily to assess a certain valuation to them.
We feel that an award of at least Twelve Thousand Five Hundred Dollars ($12,500) is probably justified by the record for the pain and suffering this boy has undergone, and also for the relatively minor permanent disability he will suffer throughout the remainder of his life; see Marler v. State of Louisiana, La.App., 78 So.2d 26, McNulty v. Toye Brothers Yellow Cab Co., La.App., 73 So.2d 23, Bergeron v. Department of Highways, La.App., 1 Cir., 50 So.2d 337, Landry v. News-Star World Pub. Corp., La.App., 46 So.2d 140, 149.
Special damages for medical care, etc., to date of trial were stipulated up to $3,321.59 by defendants. Certain other items of special damages are claimed by plaintiff, and denied by defendant as not due to the accident at all. The cost and hospitalization of re-treating the re-fracture and certain medical services, in the amount of $296.62, which we feel plaintiff has borne the burden of proving as damage caused him by the accident, will be allowed, as well as additional maid service in the amount of $152. This total of special damages proven or stipulated amounts to $3,770.21.
Plaintiff claimed $700 for "miscellaneous", being at the rate of $2 per day for magazines, gas to go to drugstore, etc. We will disallow this item as not being proved with sufficient certainty. Plaintiff also claimed one-half ($210.12) of the cost of an air-conditioning unit installed to make more comfortable the bed-ridden youngster during eight summer weeks. The admitted life expectancy of this unit is 5 years, and the most cost we could hold attributable to the accident is for the eight weeks used by the bed-ridden boy of the 260 weeks' life expectancy, or about 3% of the cost. But we do not feel the record clearly indicates that this unit was purchased solely because of the boy's illness, and as a necessary result thereof, and we will not allow same. There is an additional item of damage to the scooter claimed in the amount of $150, but we believe this to be in the miscellaneous items stipulated as admitted owed at Tr-239, and included in the total above.
The estimated surgical and hospitalization costs attendant upon the osteotomy surgical procedure recommended for young Smith is $1,000, and we feel the medical testimony indicates that this procedure is advisable and desirable. We feel special damages should be allowed plaintiff for this procedure, which the evidence indicates definitely to be planned as an essential part of the medical treatment of the injuries sustained by young Smith. We might add that in his petition, plaintiff had pleaded for an item of "future medical expenses" sufficient to cover this item, as well as the excess of medical expenses incurred subsequent to filing of the petition.
The uncontradicted medical testimony also indicates that young Smith will need heel lifts for the rest of his life; while we could award an additional amount separate, we have already included this item insofar as it is to be incurred after emancipation or majority in the lump sum award for pain, suffering, and future disability; insofar as to be incurred before emancipation *171 or majority (the boy now being 18 years of age), we feel that the award of future medical expenses herein based on an estimate of the cost should be sufficient to cover this minor additional item.
For the above and foregoing reasons, the judgment of the District Court herein rejecting plaintiff's demand is reversed, and judgment is rendered herein in favor of plaintiff, James A. Smith, individually in the amount of $4,770.21, together with legal interest thereon from date of judicial demand until paid, and in his favor as administrator of the estate of his minor son, James Emmett Smith, for said minor's use and benefit, in the additional sum of $12,500, together with legal interest thereon from date of judicial demand until paid; said judgment to be rendered against all defendants (Mrs. Martha Vega Hicks and Mrs. Lester P. LeGrange, each for their virile share of the sum due by Joseph H. Hicks, deceased, for whom they were substituted as parties defendant by order of court; Gulf States Utilities Company; and the Manufacturers Casualty Company) in solido to the amount of Ten Thousand Dollars, together with legal interest from date of judicial demand until paid; and for all amounts in excess of that amount, the Hicks defendants (each limited to her virile share thereof) and the Gulf States Utilities Company are cast in solido. Defendants to pay all costs of these proceedings and of this appeal.
Reversed and rendered.

On Application for Rehearing.
PER CURIAM.
Defendants have called to our attention on application for rehearing that the liability of Manufacturers Casualty Insurance Company included not only up to $10,000 for bodily injury, but also property damage in addition thereto. The total recovery allowed included $150 property damage (for the motor scooter). Defendants have requested in the alternative that our decree be amended to hold Manufacturers Casualty Insurance Company in solido with the other defendants to the amount of $10,150 with interest, rather than $10,000 with interest as provided in the original decree; and it is hereby ordered, adjudged, and decreed that the decree in the original opinion be amended accordingly.
Rehearing denied.