ELLIS, Judge.
Plaintiff has appealed from a verdict of a jury and a judgment in accordance therewith, dismissing her suit for damages which she alleged had been suffered when a Harley-Davidson motorcycle which she was riding was struck by a Cadillac automobile owned and operated by one Fernand Guid-roz, on the afternoon of November 28, 1955, at the intersection of Simcoe and North Sterling Street in the city of Lafayette, Louisiana.
At approximately 3:30 P.M. on the afternoon of November 28, 1955 Mr. Guidroz, the insured of the defendant, accompanied by his wife was driving his Cadillac automobile on North Sterling Street, which, to the south of Simcoe Street, runs in a general northwesterly direction, and as Simcoe Street runs east and west, the former therefore intersects at an angle. Mr. Guidroz intended to cross Simcoe Street and proceed on North Sterling Street, which, on the north side of Simcoe Street, intersects at a right angle, and Mr. Guidroz, as he came up to the intersection and started to cross, would be facing or looking in a northwesterly direction.
The plaintiff was riding her motorcycle coming from the east going west on Simcoe Street and was therefore proceeding in the right or west bound traffic lane which is also the north lane of traffic on Simcoe Street. To the east of the intersection of North Sterling Street and Simcoe there is a traffic light located at the intersection of Moss Street Extension and Simcoe. *599 This traffic light according to map of survey of Fred L. Colomb filed in evidence is 463.5 feet from the intersection of North Sterling Street and Simcoe Street. According to the city map in the record this traffic light is 600 feet west of the intersection of North Sterling and Simcoe Street where the accident happened. This variation is immaterial to a final decision in this case.
On the date of the trial Mr. Guid-roz had died and the only eye witnesses to testify were the plaintiff and Mrs. Guid-roz. Their versions are in direct conflict but we have the physical facts and the testimony of the police officer of the City of Lafayette. Although some effort was made to show bias on the part of the police officer against defendant insured, we are unable to believe that the jury disbelieved his testimony, which seemed to be very straightforward and which defendant in brief does not attack. Another fact which must be kept in mind of great importance in this case is that the plaintiff was traveling on Simcoe Street which is the favored or right of way street and, therefore, the defendant’s insured, Mr. Guidroz, was legally bound to yield the right of way to the plaintiff if he saw or should have seen plaintiff approaching on Simcoe Street, unless the facts show that at the time he could and should have seen the plaintiff, that he could reasonably assume that he had time to cross in safety.
Plaintiff testified under direct and cross examination that she was behind two cars a distance of about two car lengths and that all three motor vehicles stopped in the position described for the traffic light at the intersection of Moss and Simcoe Streets which, as previously stated and explained, was either 463.5 or 600 feet distance from the intersection of North Sterling and Sim-coe Streets. When the light changed the three motor vehicles proceeded west on Simcoe Street, with the second vehicle approximately two car lengths behind the first and plaintiff the same distance behind the second. Plaintiff proceeded in the center of the north or right hand traffic lane easterly on Simcoe Street at approximately 12 miles per hour behind the two automobiles, which successfully crossed the intersection of North Sterling and Simcoe; that shortly prior to entering the intersection she saw the black Cadillac of Mr. Guidroz, either going very slow or stopped at the intersection, and she therefore entered and attempted to cross behind the two automobiles; that the Cadillac driven by Mr. Guidroz came on into the intersection and struck plaintiff according to her testimony after she had completed more than half of the intersection and at approximately the center of her lane of travel.
Mrs. Guidroz’ version is quite different from plaintiff’s. She stated that her husband drove slowly up to the intersection of North Sterling and Simcoe Streets and came to a stop, and that they had a perfect vision both ways down the latter street, and she saw a car proceeding from the west going toward the east, and when they looked to the east they saw three cars stopped at the traffic light at the intersection of Moss and North Sterling Street, which is at least 463.5 feet from the intersection of North Sterling and Simcoe, and that her husband then knew he had plenty of time to cross after the car going east had passed, so he started slowly across Simcoe Street. She further testified that after they had gotten into the intersection she saw plaintiff on the motorcycle come out from the right hand side of the leading car of the three that she testified had been parked at the stop light when they came to the intersection; and that plaintiff was going at a terrific pace, and she then gives the impression that the plaintiff was not struck by the car but attempted to avoid the car and fell in front of the car, but due to the fact that her husband was driving very slowly he stopped before running over plaintiff. It is her positive testimony that plaintiff was attempting to pass the three cars on the north or right hand side which would be, in common parlance, the wrong side and, therefore, they were unable to see her until she came out in front of the *600 leading car. She also stated that the three cars passed to the rear of their Cadillac car as she testified Mr. Guidroz “went in enough in North Sterling that the cars never stopped back of his car.” With all due respect Mrs. Guidroz’ version is impossible for the record shows that Simcoe Street is 20 feet in width and, further, that the point of impact was ljdá to 2}/z feet north of the center line of Simcoe Street which Mr. Guidroz was crossing in his Cadillac, and after coming to a dead stop and seeing the three cars parked at the traffic light more than 400 feet away, her husband then went into the intersection at a speed of five to six or eight to twelve miles per hour, and he had gone slightly over half of the 18 foot roadway plus, at the most, 2Y2 feet more, or a total distance of ÍI1/2 to 12i^ feet when he struck the plaintiff on her motorcycle. At ten miles an hour a car travels 14.6 feet per second and it was therefore physically impossible for the three cars and the plaintiff motorcyclist to have, within that second, traveled from the stop light at Moss Street to North Sterling Street where the accident occurred, or 463.5 feet.
In addition we have the testimony of the police officer who investigated this collision, and he testified that when he got there and located the point of impact at 114 to 2;4 feet past the center line of Sim-coe Street that he talked to the driver of the Cadillac automobile, Mr. Guidroz, who told him, which was within fifteen minutes after the actual collision, that “he didn’t see her.” His exact testimony in referring to his meeting with Mr. Guidroz immediately after the accident is as follows: “He seemed a little nervous. Most people are when they are involved in an accident. Pie stated that he didn’t see her.” It is true that this testimony was ruled inadmissible and the District Judge instructed the jury to disregard that portion of the testimony as to what Mr. Guidroz told the police officer. It is more than likely and most probable that had the jury been instructed to accept this testimony or rather had the court’s ruling been that it was admissible, the verdict would have been different. The testimony is clearly admissible as an admission against interest and is an exception to the general hearsay rule. See Hood v. Glass, La.App., 198 So. 543; Demasi v. Whitney Trust & Savings Bank, La.App., 176 So. 703; Smith v. Manufacturers Casualty Insurance Company, La.App., 83 So.2d 164; Abunza v. Olivier, 230 La. 445, 88 So. 2d 815.
We believe that Mr. Guidroz’ statement to the effect that “he didn’t see her”, referring to plaintiff, is exactly what happened. Had it been as Mrs. Guidroz stated it would have been almost impossible for the leading automobile at least to have avoided colliding with the Cadillac as it stopped with its front end just a few feet beyond the point of impact, which was from two to two and one-half feet on the north side of the center line of Simcoe. Furthermore, the Cadillac struck the motorcycle. The police officer testified that there was a black smear of paint, which was the same color as the motorcycle, on the front bumper of the Cadillac and the left crash bar of the motorcycle was also damaged. There was also slight damage on the right front fender to the rear of the headlight on the Cadillac automobile.
We believe for the above and foregoing reasons that the verdict of the jury was manifestly erroneous on the question of liability. The proximate cause of the collision was the negligence of Mr. Guid-roz in failing to see the motorcycle which was following two cars. The two cars undoubtedly passed in front of him and he then went on into the intersection. He clearly should have seen the motorcycle.
After the accident plaintiff was brought to the Lady of Lourdes Hospital in Lafayette, Louisiana, and was seen by Dr. William L. Meuleman who described her condition at that time as being emotionally upset as a result of the accident and she had “a good deal of multiple complaints compatible of being recent injury, and evi *601 dence over the head particularly, definite area of contusions and nasty brush burns over the back portion of the right shoulder. Then, there was a rather diffused tenderness and enough to prohibit any use of the shoulder, of that same shoulder. Now, there were brush burns around the knees and then minor scratches and scrapes about the rest of the body. The chief injury of the brush burns was the back portion, right shoulder, knee and the tenderness about the end of the right shoulder.” Dr. Meuleman felt that plaintiff had a severe injury to the right shoulder, which he tentatively diagnosed as a fracture of the shoulder. Plaintiff remained in the hospital approximately five days, during which time opiates were administered to control the pain element. After her discharge, this doctor saw plaintiff approximately five times in December, twice in January, once in February, and twice in March, and as a result of satisfactory X-rays a final diagnosis “shows the fracture of the outer end of the shoulder blade, that should have been the outer end of the clavicle. Then, under observation it became apparent that in addition to this fracture to the outer end of the collar bone she was developing signs of Acromio-clavicular separation of that same shoulder, and a subsequent film study that was made at Dr. Miles Romagoza and Klinger showed a separation of that joint, and it was also noted what was reported as a Periosto reaction of the outer end of the clavicle, and no definite evidence of fracture at that time. I felt that the thing had healed in the time interval in the past.”
Without detailing, further, the medical testimony shows that she ended up with a separated shoulder and one that was spoken of as a “frozen shoulder.” In other words, she was unable to raise her arm higher than level or over her head. Plaintiff was 24 years old and at the time of the accident was employed at semi-manual labor earning $36 per week. She had a life expectancy of 39.49 years. The doctors stated that she has a fifty percent disability, which with use of the arm will subside to 15-20 per cent of the shoulder, which will inhibit her from doing manual work. Although it would be slightly painful in some types of duties of a housewife, for approximately $500 worth of surgery and hospitalization, including about two months therapy, the doctors feel that in all probability this could be reduced to a nominal 5% loss of mobility in the shoulder by minor surgery. The actual medical expenses of plaintiff apparently total $496.80. As to loss of earnings, plaintiff testified that she had lost $2,000 to date but the evidence shows that she went back to work about 2 months after the accident, worked nine months, and then quit because she stated “it hurt too much.” She has been living with friends since that time.
Her pain and suffering, the permanent residual in the shoulder, and the possibility that an operation will not be as successful as the doctors prognosticate, we believe that an award of $7,500 would' be proper. Plaintiff should be awarded special damages for her medical expenses of $496.80 plus $500 for estimated cost of future surgery, plus loss of wages for the actual two months she lost, plus three estimated convalescent periods from the surgery, or five months (21% weeks) wages at $36 per week or $768, making a total of $9,264.80.
It is therefore ordered, adjudged and decreed that the verdict of the jury and judgment of the court be reversed and set aside and that there now be judgment in favor of the plaintiff in the full sum of $9,264.80 and against the defendant, Great American Indemnity Company, with legal interest from judicial demand until paid.
It is further ordered that the defendant pay all costs.
Judgment reversed and rendered in favor of the plaintiff.